Greco, PJ.
Judgments were entered in this case for plaintiff Compliance Management Group Corporation (“Compliance”) on both its complaint against Quest Engineering Solutions, Inc. (“Quest) and on the counterclaim filed by Quest. This appeal by Quest relates only to the judgment on the counterclaim. Quest claims that the trial judge erred (1) in dismissing the counterclaim as a sanction for its noncompliance with the court’s discovery orders, and (2) in allowing Compliance’s motion for summary judgment on the counterclaim.
It is not clear what Compliance was seeking in its complaint because the record contains Quest’s answer and counterclaim, but not the complaint. Quest alleges in its counterclaim that in January of 2002, it entered into an agreement with Eric Wilbur (‘Wilbur”) whereby Wilbur was to perform “marketing services” for Quest; that Wilbur subsequently caused Compliance “to be formed;” that Wilbur is the director, president, and treasurer of Compliance; that Compliance “assumed and adopted ... as its own” the January, 2002 agreement, which contained an obligation not to compete with Quest; and that Wilbur and, by extension, Compliance breached that provision as well as provisions not to use “confidential and proprietary information” and not to induce Quest’s “employees to leave [its] employ.” Quest further alleges that these breaches occurred before Compliance and Quest “replace[d]” the January, 2002 agreement with a different agreement in 2004. Quest sought damages for these contract breaches and under G.L.c. 93A.
Compliance moved to dismiss Quest’s counterclaim on the ground that Quest failed to provide adequate answers to certain interrogatories. Quest alleged in its counterclaim that “on information and belief, [Compliance] engaged in acts competitive to Defendant, in breach of [their] Agreement;” and that Compliance “utilized confidential and proprietary information ... in setting up its competitive business.” In its first set of interrogatories, Compliance asked Quest to “state each and every fact’ in support of these allegations. In its initial response, Quest stated that it “had not yet completed discovery” and gave, based on “information and belief,” a very general description of its claims, devoid of any specifics concerning the time, manner, and employees involved with respect to any such breaches. The trial judge allowed Compliance’s motion to compel a further answer. Quest responded to that order with a much more detailed account of the acts alleged to be competitive, but with essentially the same general answer concerning the use of confidential and proprietary information, merely omitting the use of the term, “on information and belief.” The trial judge ordered further responses. In the tran *80 script of the hearing on Compliance’s motions for sanctions and for summary judgment, reference was made to a further answer filed the day before (i.e., May 9, 2006), but no such response appears in the record before us. On May 11, 2006, the trial judge ruled on the motion for sanctions and dismissed Quest’s counterclaim.
Compliance also moved for summary judgment on Quest’s counterclaim on the ground that Quest “relinquished” any claims it may have had for violations of the 2002 agreement when it entered into the April, 2004 replacement agreement which contained neither a covenant not to compete, nor a confidentiality clause. In allowing Compliance’s summary judgment, the trial judge also stated that “the specific facts proffered by Quest would not be sufficient to prove a breach of a non-compete clause or any damages resulting therefrom” (emphasis in original).
The 2002 agreement indicated that it was “intended as an interim agreement,” that it was anticipated that Wilbur would form a corporation to undertake its obligations, and that “certain provisions may change.” The agreement contained a covenant not to compete during its term and “in the case of Existing Clients... for a period of one (1) year thereafter.” Competition was “deemed to include engaging in any activity ... intended to attract or induce” any employee of Quest “to leave such employ.” It was expressly provided that the covenant not to compete along with an agreement not to disclose confidential or proprietary knowledge and information “would survive the termination of this Agreement for a period of 2 years.” The initial term of the whole agreement was three months, and would be automatically extended “for successive one (1) month periods” unless either party gave written notice of its intention not to extend.
Consistent with the anticipation expressed in the 2002 agreement, a new agreement was entered into in April of 2004, which stated that it “replace [d]” the January, 2002 agreement between Quest and Wilbur. Wilbur signed the new agreement as president of Compliance, not in his personal capacity. Not only did the parties change, but the whole arrangement changed, although it is difficult to determine from the four corners of the agreement what the new arrangement was. Among other things, the agreement included references to the payment of Quest’s invoices by Compliance, but then to a retention of funds as repayment of money owed by Quest to Compliance; to the payment of rent by Compliance to Quest; to specific individuals using office space in return for “support to Quest;” to how much a specific person would be paid by Quest “for CMG tests;” to payments from revenue by Quest to Compliance in order “to accelerate the loan payments due” to Compliance; and to Quest’s obligation to provide Compliance with a copy of its “Quality Manual.” In addition, the parties were to “maintain the current business relationship including the use of the present office and lab space within Quest.”
# A document submitted by Compliance in support of its motion for summary judgment may have served to shed some light on these rather cryptic provisions. Six months before the April, 2004 agreement was signed, the president of Compliance sent to the president of Quest an e-mail to which was attached an outline of a new agreement to replace the 2002 agreement. A completely different arrangement was proposed. Compliance would no longer be Quest’s sales representative; instead, Compliance would subcontract work to Quest. The former agreement would be “cancelled in its entirety. All items that would survive the termination of the old agreement [would be] also canceled, unless they [were] restated in the new agreement.” The new agreement would also “replace any existing written or unwritten agreement” between Quest and Compliance.
The trial judge allowed Compliance’s motion for summary judgment the day after he had dismissed the counterclaim by way of his ruling on the motion for sanctions. If the dismissal were to be affirmed, we need not reach the issues *81 raised on summary judgment
What sanction to impose for the violation of discovery orders lies in the trial judge’s discretion. See Partlow v. Hertz Corp., 370 Mass. 787, 790 (1976). In Partlow, the Court noted that “ [wjhile dismissal of the plaintiffs complaint is not a trivial sanction,” it was appropriate in view of “the plaintiffs or his counsel’s lack of diligence and apparent failure to take seriously the responsibility of conducting litigation in compliance with the rules of civil procedure.” Id. It would be difficult to characterize Quesfs conduct in the same way with respect to its response to the interrogatory seeking information on the claim for a violation of the agreement not to compete. Its first response clearly could not pass muster. However, its further answer made on February 17, 2006 was much more specific; it gave dates and named names. For example, the answer stated that Compliance had performed services for Bose Corporation and American Power Conversion Corporation that Quest had previously performed. It gave a named source of some of this information. This response was sufficient; whether it was enough to survive summary judgment will be discussed below. On the other hand, Quesfs response to the question related to the misuse of confidential information was clearly inadequate. Accordingly, we conclude that the sanction of dismissal was warranted only as to that portion of the counterclaim seeking damages for misuse of confidential information.[1]
In granting summary judgment to Compliance on Quesfs counterclaim, the trial judge ruled that by entering into a new agreement, Quest relinquished any claims it had under the 2002 agreement. Whether Quest did so presents “questions of construction and interpretation” that “may be difficult to resolve, particularly if the second contract made by the same parties deals with the same subject matter as the first contract and does not state whether or to what extent it is intended to operate in discharge or substitution.” 13A CORBIN, CONTRACTS §71.1(5), at 412-413 (rev. ed. 2003). Here, there are added difficulties because the two agreements do not technically involve the same parties. Although it was clearly contemplated in 2002 that there would be a different arrangement in the future, Quest went from dealing with Wilbur as an individual to dealing with Compliance. In fact, the 2002 agreement specifically provided that Wilbur would “form a corporation to undertake [his] obligations.”
The 2004 agreement could fairly be viewed as a substituted contract at least as to some provisions. However, to determine to what extent this later agreement was meant to discharge any obligations under the 2002,
the two contracts must be construed together. Insofar as they are inconsistent, the later one prevails; the remainder of the first contract, if consistent with the second in substance and in purpose can be enforced. If there are claims for monies due under the previous contract or for damages for breaches committed, these are discharged by the substitution of the new executory agreement if such an intention is sufficiently expressed.
Id. at 413-414. See Pagounis v. Pendleton, 52 Mass. App. Ct. 270 (2001), where the Appeals Court stated that
[a]lthough ‘a substituted contract or novation may be inferred despite a lack of express language to that effect’... and may be based solely on *82 the circumstances and conduct of the parties,... a finding of an intent to discharge the preexisting indebtedness should rest on a ‘clear and definite indication’ of such intent.... Whether the parties intended a novation was a factual question ... as to which [a defendant], asserting it as an affirmative defense, bore the burden of proof.
Id. at 273, quoting Lipson v. Adelson, 17 Mass. App. Ct. 90, 92-94 (1983).
With respect to any covenant not to compete, there is no inconsistency between the 2002 and 2004 agreements. The earlier one has such a covenant; the later one does not. That Quest may have felt the need to have one earlier, but not later, does not imply it could not seek damages if it was learned that there had been prior violations. In Lipson, the Appeals Court gave as an example of an inconsistency “a second contract... [calling] for a building of a house according to a different set of plans from those contemplated originally.” Lipson, supra at 94. Obviously, the house could not be built two ways. On the other hand, Quest could have changed its mind about the necessity of a covenant not to compete. Finally, it should be noted that the document referred to above which Compliance presented on summary judgment is ambiguous at best. While it indicated that the old agreement was “canceled in its entirety,” it specifically stated that “[a] 11 items that would survive the termination of the old agreement [would] also [be] canceled, unless they are restated in the new agreement.” This could be taken as referring to that portion of-the covenant not to compete which would survive the termination of the 2002 agreement. If so, that the parties were canceling only one portion of the covenant not to compete may be some evidence that there was no intent to extinguish claims for violations that had already occurred. In these circumstances, with respect to any violations of the covenant not to compete occurring before the 2002 agreement terminated, Compliance has failed to satisfy its burden, as the moving party, “of affirmatively demonstrating the absence of a material issue of fact by either submitting evidence that negated an essential element of [Quest’s] case or showing that proof of that element was ‘unlikely to be forthcoming’ at trial.” Clarke v. Mal Elfman’s Furniture Store, 2005 Mass. App. Div. 160, 161, quoting Kourouvacilis v. General Motor Corp., 410 Mass. 706, 714 (1991). The 2004 agreement, however, clearly extinguished any claims for violations occurring after the 2004 agreement was executed.
Accordingly, summary judgment on Counts 1 and 5 of Quest’s counterclaim is vacated, and the case is returned to the trial court on those counts. Summary judgment on Count 3, as well as the dismissal of Counts 2 and 4, are affirmed.

 It may well be that this is exactly what the trial judge contemplated since it made little sense to act on a motion for summary judgment on a claim he dismissed the day before.